51 A.3d 793

STATE OF NEW JERSEY IN THE INTEREST OF A.W.

Argued May 15, 2012—Decided September 25, 2012.

*Brian F. Plunkett,* Assistant Deputy Public Defender, argued the cause for appellant A.W. (*Joseph E. Krakora,* Public Defender, attorney).

*Frank J. Ducoat,* Deputy Attorney General, argued the cause for respondent State of New Jersey (*Jeffrey S. Chiesa,* Attorney General, attorney).

*Laura A. Cohen* argued the cause for amicus curiae American Civil Liberties Union of New Jersey Foundation (*Rutgers Urban Legal Clinic Center for Law & Justice and Rutgers Constitutional Litigation Clinic Center for Law & Justice,* attorneys; *Ms. Cohen, Ronald K. Chen, Edward L. Barocas, Jeanne M. Locicero, Alexander R. Shalom,* of counsel and on the brief).

Justice HOENS delivered the opinion of the Court.

More than a decade ago, this Court established the framework for our trial courts to use when deciding whether a confession given by a juvenile in a custodial setting was voluntary and therefore admissible in a delinquency proceeding. *See State v. Presha,* 163 *N.J.* 304, 312–17, 748 *A.2d* 1108 (2000). Among the wide variety of factors that bear on an evaluation of voluntariness, we considered the role played by a juvenile's parent during questioning and we addressed the implications of the parent's absence from an interrogation. *Id.* at 314–17, 748 *A.2d* 1108. In establishing the analytical framework for courts to use in their evaluation of the voluntariness of a juvenile's confession, we drew an age-based distinction. We found that there are special circumstances involved for a juvenile who is less than fourteen years old and we created a presumption for such juveniles when their statements are taken when a parent or guardian is absent. *Id.* at 315, 748 *A.2d* 1108. The test that we devised required an analysis of whether the parent was either truly unavailable or was unwilling to be present for the interrogation and we conditioned admissi-

bility on a finding that the absent parent satisfied one of those two criteria. *Ibid.*

Thereafter, we addressed in further detail the meaning of the "unwilling to be present or truly unavailable" exception to *Presha's* otherwise bright-line approach to juveniles younger than fourteen years old. *See State ex rel. Q.N.*, 179 *N.J.* 165, 843 *A.*2d 1140 (2004). We concluded that a parent who had been advised of her right to remain during the interrogation, who had urged her son to answer truthfully, who left the room and who observed the interrogation from a nearby vantage point had sufficiently demonstrated her unwillingness to be present to satisfy the *Presha* test. *Id.* at 173–78, 843 *A.*2d 1140. At the same time, we observed that the parent had not initiated the decision to leave, but had left following the suggestion of the interrogating detective. *Id.* at 174, 843 *A.*2d 1140. Although that fact was insufficient to demonstrate involuntariness, we commented that in the future, "to remove all doubt about an adult's willingness to be present" the police should wait for the suggestion about leaving the interrogation room to come from the parent. *Ibid.*

The appeal now before the Court requires us to consider whether, under the circumstances, the questioning detective failed to comply with these protections and whether, therefore, the statement that the juvenile A.W. gave to the interrogating detective should have been suppressed. More specifically, we consider whether the detective's comments during the course of the interview constituted an impermissible suggestion that the parent leave and whether the detective used interrogation techniques that were unduly coercive and therefore inappropriate for questioning a juvenile.

I.

The essential facts may be summarized briefly. On November 21, 2008, E.R. came home from work to find her five-year-old daughter K.P. watching television in her room. When the child, who was covered with a blanket, got up, her mother noticed that

the child's pants were unzipped. When E.R. asked K.P. to explain why her pants were unzipped, the child said that she was touching herself because that is what her cousins A.W. and J. did. Upon further inquiry, the child gave her mother a graphic account of the acts that A.W., the juvenile defendant in this matter, performed on her and asked her to perform on him. She also told her mother about acts that her cousin J. performed on her. At the time of the events, A.W. was thirteen years old and J. was ten years old.

E.R. took the child to the emergency room for an examination, which led to an investigation by the Union County Prosecutor's Office. The next day, K.P. described for Detective Janet Lopez the same series of acts that she had reported to her mother. K.P. was subsequently examined by a physician who found no physical evidence of sexual abuse, but who opined that such a finding is consistent with the acts that the child had described.

## A.

Because the focus of the appeal is on the interrogation of A.W., we describe it in detail. Detective Lopez contacted A.W.'s parents, and his father voluntarily brought him to the Union County Child Advocacy Center for an interview on November 26, 2008, shortly after 10:00 a.m. A.W. was not under arrest when he made his statement and the interview lasted for approximately forty-five minutes. A.W. is bilingual, but because his father speaks very little English, the interview was conducted initially entirely in Spanish.

At the start of the interview, Detective Lopez used a pre-printed juvenile rights form,[1] written in Spanish, to advise A.W.

---

[1] The transcript of the interrogation reveals that one of the questions included on the form inquired of the juvenile whether he wanted his father present or not. At oral argument, the Attorney General conceded that, in light of this Court's requirement that a parent be present for interviews of juveniles under the age of fourteen unless, viewed from the parent's perspective, the parent is unavailable or unwilling to be present, this particular question is not "relevant" to the explanation of rights. Although not a focus of this appeal, it appears to be

and his father of A.W.'s rights. *See Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966). Detective Lopez read the form aloud to them and then she had A.W. read portions of the form aloud as well. After reviewing the waiver form, both A.W. and his father signed it, placing their initials after each individual question.

The interview began with general questions about A.W.'s visits to the victim's home. When Detective Lopez first brought up K.P.'s allegations, A.W. denied touching her in a sexual way, stating instead that their other cousin J. had inappropriately touched K.P. When Detective Lopez asked A.W. to repeat what J. had said about touching the child, A.W. switched from Spanish to English and asked the detective if he could say it to her in English. Detective Lopez permitted him to do so and A.W. then told her in English that J. had said he had been touching K.P. and did not want A.W. or anyone else to find out. Detective Lopez then resumed speaking in Spanish, repeating only that J. did not want anyone to find out but not translating into Spanish for A.W.'s father what A.W. claimed J. had revealed. As the questioning continued in Spanish, the Detective again turned the questioning to K.P.'s allegations against A.W., who repeated his denial of any wrongdoing. The English translation of what A.W. said is "I didn't touch her, because she is family and all, and I don't touch younger girls and all that."

In response to that statement, Detective Lopez, still speaking in Spanish, made further comments to A.W., the English translation of which is as follows:

Det.: Okay, I know that your dad is here.

A.W.: Yes.

Det.: And he's a big man, and you can tell that he is worried and it is a sad thing and it's also a very serious thing.

A.W.: Huh.

---

inconsistent with the directive in *Q.N.* that the police not suggest that a parent be asked to leave. *See Q.N., supra,* 179 *N.J.* at 177, 843 *A.2d* 1140.

Det.: I want to tell you that I interviewed a boy in the same position as you are in and he denied it, denied it and denied it in the beginning, then at the end he finally told me, and they tell me because they don't want to do it again, they also want help.
A.W.: Uh-huh.

Detective Lopez explained that if K.P.'s allegations were true, she was "ninety-nine point nine percent certain" that A.W. would not go to jail or a juvenile facility, and instead would likely receive therapy. She commented that she was there to help, suggested that perhaps he had been experimenting and that the behavior was not something that he would do again, and stressed that it was important that he tell the truth. Still speaking in Spanish, Detective Lopez referred again to A.W.'s father, commenting that "I know it's hard because your dad is here beside you um ... it's something really painful and it's really sad, and that maybe you don't want to talk about."

At that point, A.W. answered in English, saying "Yeah I know" and he and Detective Lopez then spoke again briefly in English. During that exchange, Detective Lopez again stressed the importance of being honest, told A.W. that she was there to help him, and told him that he would not likely go to jail. The detective then switched back to Spanish, and told A.W. that J. had already confessed to touching K.P. many times and to touching her with his penis for more than a year. She then told A.W. that J. had reported that A.W. had done the same thing, and that K.P. had made such allegations against A.W. as well.

By that time approximately twenty minutes had elapsed. Without any further prompting, A.W. asked Detective Lopez in English, "Can I say something?" and then stated, "Um ... could I tell everything in private, like without my dad here, outside, it will be easier." Detective Lopez responded by telling him that she would explain that to his father, which she then did in Spanish. At that point, A.W.'s father immediately stood up to leave. However, before Detective Lopez agreed to speak with A.W. outside of the presence of his father, she advised A.W.'s father, who sat back down while she spoke to him, that he would need to agree to waive

his right to be present during the interview before leaving, and she explained that he was free to change his mind at any time and could return to the interview room if he chose to be present. Conversing in Spanish, A.W.'s father began to comment to confirm that A.W. wanted to talk to the detective without his presence, and A.W. interrupted him to reiterate that this was his desire. The detective pointed out to A.W.'s father that she could not "force" him and he responded by saying that "it's fine, it's fine." A.W.'s father then signed the required waiver form without objection, and left the interview room at approximately 10:44 a.m.

After his father left the room, A.W. continued to deny that he had touched K.P., blamed J., and gave excuses about why K.P. would accuse him before eventually admitting that he had touched K.P.'s vagina on one occasion. A.W.'s father reentered the room at approximately 11:00 a.m., and Detective Lopez summarized A.W.'s statements for him. When the interview was over, A.W. was allowed to go home with his father without being placed under arrest. A.W. was thereafter charged as a juvenile with two counts of aggravated sexual assault.

## B.

Prior to being adjudicated, A.W. moved to suppress the video-tape of his interview. In support of that motion, A.W. argued that the detective violated his rights by using coercive interrogation techniques that are inappropriate in questioning juveniles and that considering the totality of the circumstances, the confession was unreliable.

During the hearing on the suppression motion, A.W. testified that he had not committed the acts with which he was charged. Particularly relevant to whether his rights were violated when he was interrogated outside of the presence of his father, A.W. did not deny that he asked his father to leave the interview room. Instead, he conceded that he had made that request, but explained his reason as follows: "[bec]ause in situations I usually—I handle them myself. But then I had—I, I did the wrong choice of taking

him out of the little office room ... I'm used to handling situations for myself. But that I thought I could handle myself in that situation, but I was wrong."

A.W. then testified that after his father left the interview room, he was having trouble trying to express to the detective that he did not do anything to K.P. According to A.W., as he was trying to talk, Detective Lopez repeatedly cut him off. He asserted that because she cut him off, he "started getting aggravated. And then [he] just told her something she wanted to hear."

During cross-examination, A.W. acknowledged that he never asked Detective Lopez to stop cutting him off, never asked for his father to return to the interview room, and never stated that he wished to end the interview with Detective Lopez. He also conceded that he was not restrained in handcuffs, placed under arrest, or charged with a crime prior to the interview, and he admitted that Detective Lopez did not yell, curse, or use physical force during the interview.

Detective Lopez also testified during the hearing. When defense counsel asked why she told A.W. that his father was a "big man" during the interview, she answered, "I don't know. But he was a big man, and that's the statement that I made. It was just an observation. I also said that he seemed worried. It's another observation I made."

The trial court denied the motion to suppress, concluding that A.W.'s father had not been excluded improperly from the interview room and that A.W.'s will had not been overborne by the use of coercive interrogation techniques. In explaining its reasoning, the trial court compared the record relating to the parent's absence to *Q.N.*, noting that A.W.'s father had the opportunity to "observe and assess the tone of the interview" and only left the room after A.W. said that he wanted to speak about the matter outside of his presence. Moreover, the trial court rejected the argument that the detective had suggested that the parent leave or engaged in any other inappropriate behavior that would overbear the juvenile's will. Concluding that the interview complied

with this Court's directives in *Presha* and *Q.N.*, the trial court found that the confession was voluntary and therefore admissible.

Subsequently, the trial court adjudicated A.W. delinquent on the sexual assault charges. He was sentenced to three years of probation, outpatient therapy, and the requisite fines. In addition, he was subjected to the provisions of Megan's Law, *N.J.S.A.* 2C:7–1 to –11, 19.

The Appellate Division, in an unpublished decision, affirmed. The panel independently reviewed the videotaped interview and described it to be "remarkably non-coercive." Before that court,[2] A.W. continued to challenge the voluntariness of his confession based on his father's absence from the room and based on the interrogation techniques that were used.

Addressing the absence of the juvenile's parent, the Appellate Division found no merit in A.W.'s argument that it should distinguish between a parent who voluntarily leaves the interrogation room and one who complies with a juvenile who has initiated the request for the parent to leave. Instead, the panel concluded that the standards that this Court has fixed for permissible questioning of a juvenile in the absence of a parent are satisfied "[s]o long as the parent leaves voluntarily and is carefully instructed, as A.W.'s father was here, that he could return at any time[.]" Moreover, the appellate panel rejected A.W.'s contention that Detective Lopez utilized unfair psychological techniques to induce him to request that his father leave the room. Rather, the panel's review of the record revealed nothing to demonstrate that A.W. did not

---

[2] At the trial and appellate levels, the juvenile also argued that he was denied the right to a fair trial because the testimony of the physician who examined K.P. repeated her allegations of abuse, thereby including hearsay. That assertion was rejected based on the tender years exception. *See N.J.R.E.* 803(c)(27). A.W.'s petition for certification initially included this point, but he did not address it in his supplemental brief and did not raise it during oral argument. Although it might therefore have been waived, *see El–Sioufi v. St. Peter's Univ. Hosp.*, 382 *N.J.Super.* 145, 155 n. 2, 887 *A.2d* 1170 (App.Div.2005), we decline to address it because we conclude that it is without merit.

independently decide to request the opportunity to speak without his father being present.

The Appellate Division likewise held that, even after giving extra weight to A.W.'s father's absence for a portion of the interview, the confession was voluntary based on the totality of the circumstances. Evaluating the record in accordance with this Court's well-settled precedents, the panel found nothing in the interview techniques used by the detective that sufficed to overbear the juvenile's will or otherwise make his confession involuntary.

This Court granted A.W.'s petition for certification, 208 *N.J.* 336, 27 *A*.3d 949 (2011), and we thereafter granted leave to the American Civil Liberties Union of New Jersey (ACLU–NJ) to participate as an amicus curiae.

## II.

Defendant A.W. challenges the admissibility of his statement, raising before this Court two arguments in support of his position that the trial and appellate courts erred in concluding that it was voluntary.

First, he argues that although his father left the interview room, his father's absence was procured by subtle suggestions and pressure exerted upon him by the interrogating detective. Therefore, A.W. urges this Court to conclude that his father was neither "truly unavailable" nor "unwilling" to be present as would permit him to be interviewed outside of his father's presence, *see Presha, supra*, 163 *N.J.* at 315, 748 *A*.2d 1108, thereby making his statements involuntary and inadmissible. In support of this argument, A.W. asserts that the detective effectively marginalized his father by switching to English, therefore depriving his father of the opportunity to effectively evaluate whether he should leave or remain. In addition, A.W. argues that the detective's reference to his father as being a "big man" was a subtle suggestion to A.W. that he would be better served if his father left the room.

Second, defendant challenges the interrogation techniques that were used by the detective, asserting that they failed to comport with "the highest standards of due process" as required by this Court. *Id.* at 317, 748 *A.*2d 1108. Placing great reliance on recent social science research relating to juveniles, he maintains that juveniles are "uniquely vulnerable to coercive interrogation methods." He argues that the techniques the detective used in questioning him, known as the "Reid method," [3] overbore his will, rendering his confession involuntary,[4] and he urges this Court to direct the State to refrain from using such techniques when questioning juveniles.

The State urges this Court to affirm the judgment of the Appellate Division. The State argues that Detective Lopez never suggested that A.W.'s father should absent himself from the interview and that he left the interview room voluntarily. The State argues, in particular, that there was nothing in the limited use of English in his father's presence that violated A.W.'s rights

---

[3] A.W. cites a social science journal, which describes the Reid method as a "nine-step sequence of social influence and techniques of persuasion [designed] to systematically weaken suspects' resistance and to provide face-saving rationales." Barry C. Feld, *Criminology: Police Interrogation of Juveniles: An Empirical Study of Policy and Practice,* 97 *J.Crim. L. & Criminology* 219, 236–37 (2006). According to Feld, these techniques include "developing 'techniques of neutralization' or psychological themes to justify or excuse the crime," "interrupting the suspect's attempts at denial," and "showing sympathy and urging the suspect to tell the truth." *Ibid.*

[4] A.W. does not raise many of the arguments which form the basis for our dissenting colleague's analysis. He does not assert that his confession was false, *see post* at 139–42, 146–47, 51 *A.*3d at 807–09, 811–12, or that his will was overborne because the interrogation was "intentionally structured to promote isolation, anxiety, fear, powerlessness, and hopelessness," *see post* at 147, 51 *A.*3d at 812 (citation omitted), or that the detective's statements to the effect that he "had to" speak undercut his *Miranda* protections, *see post* at 143–45, 51 *A.*3d at 810–11, yet these assertions are the overwhelming focus of the dissent. There being no suggestion by A.W. that he agrees with, or pursues relief based on, any of these assertions, they are irrelevant to the analysis of the appeal. We therefore decline to engage in a debate about these issues which are the focus of the dissent.

and nothing in the reference to his father being a big man that suggested to A.W. that he should ask his father to leave. Moreover, the State stresses that A.W.'s father was present for more than half of the interview and was there for the critical points that included the reading and waiver of A.W.'s *Miranda* rights. Further, the State asserts that A.W.'s father clearly understood his rights because he exercised them by returning to the interview room not long after leaving. Based on those facts, the State asserts that A.W.'s father met the *Presha* test for being unwilling to be present.

The State further maintains that the interview was conducted with the "utmost fairness and in accordance with the highest standards of due process and fundamental fairness." Comparing this interview with circumstances that this Court has previously found to be permissible, *see Q.N., supra,* 179 *N.J.* at 176, 843 *A.*2d 1140, the State notes that A.W. and his father willingly came in for an interview; the interview took place in mid-morning; there was only one detective, dressed in plain clothes, who conducted the interview; the detective was polite throughout the interview; age-appropriate language was used to discuss sexual matters; the interview lasted only forty-five minutes; and there was no evidence that A.W. was fatigued at any point during the interview.

In addition, the State urges this Court to reject A.W.'s request that this Court ban the use of specific techniques during interviews of juveniles or that they otherwise be free of any psychological pressure. Conceding that some psychological pressure is inherent in any police interview and that this pressure can have a heightened effect on juveniles, the State contends that those concerns are adequately addressed by the *Miranda* warnings and the parental presence rules this Court has established.

Finally, the State argues that even if this Court finds that A.W.'s statement was involuntary, its admission was harmless error because K.P.'s testimony was sufficient to carry the State's burden and support the delinquency adjudications.

Amicus curiae ACLU–NJ urges us to adopt additional prophylactic measures to ensure that the rights of juveniles are protected. First, ACLU–NJ asserts that A.W. did not knowingly, intelligently, and voluntarily waive his rights, because the *Miranda* warnings were provided to him only in Spanish. ACLU–NJ argues that because A.W. is a bilingual youth, he should have been given warnings in Spanish, his heritage language, as well as in English, his dominant language.[5]

Second, giving much attention to the developmental differences between juveniles and adults, which make juveniles more vulnerable to police interrogation tactics, ACLU–NJ asks this Court to impose a variety of new guidelines for use in interrogations of juveniles, including prohibition of the Reid method that ACLU–NJ asserts was used in questioning A.W.

Third, ACLU–NJ argues that A.W.'s father did not knowingly and voluntarily waive his right to be present for the interview. ACLU–NJ charges that Detective Lopez purposely used English at crucial points in the interview to place pressure on A.W. to have his father leave the room and did not sufficiently advise his father of his rights when she reviewed the parental waiver form with him. As a result, ACLU–NJ urges us to direct interrogators to refrain from using any kind of subtle pressure to procure a parent's absence by concluding that A.W.'s father was not "truly unavailable" or "unwilling" to be present.

---

[5] Additionally, in its brief the ACLU–NJ challenges the constitutionality of the Spanish-language *Miranda* waiver form used to advise A.W. of his rights. *See United States v. Perez–Lopez,* 348 *F.*3d 839, 848–49 (9th Cir.2003) (observing that *Miranda* warnings must be conveyed in "unambiguous" manner). Because the issue was not raised before the trial court and the Appellate Division and because A.W. has conceded that he is not challenging the waiver forms, the issue is not properly before this Court. *See, e.g., N.J. Div. of Youth & Fam. Servs. v. M.C. III,* 201 *N.J.* 328, 339, 990 *A.*2d 1097 (2010) (noting that "issues not raised below will ordinarily not be considered on appeal unless they are jurisdictional in nature or substantially implicate the public interest."); *Cnty. of Essex v. First Union Nat'l Bank,* 186 *N.J.* 46, 51, 891 *A.*2d 600 (2006) (same). We therefore decline to consider it.

Finally, ACLU–NJ argues that we should craft further protections for juveniles and that no parent should be permitted to leave a police interrogation unless the parent and the juvenile have first discussed that choice in private.

## III.

We begin with a review of the well-settled principles governing police interrogation of juveniles. We have long accorded juveniles special protections when they are subjected to interrogation. *See State ex rel. S.H.*, 61 *N.J.* 108, 114–16, 293 *A.*2d 181 (1972). In the context of examining the voluntariness of a ten-year-old's confession, we observed that "[p]lacing a young boy in the 'frightening atmosphere' of a police station without the presence of his parents or someone to whom the boy can turn for support is likely to have harmful effects on his mind and will." *Id.* at 114, 293 *A.*2d 181. Looking to the totality of the circumstances in that matter, we found it significant that the boy's father had arrived before the questioning began and was sent away by the police. We "emphasize[d] whenever possible[,] and especially in the case of young children[,] no child should be interviewed except in the presence of his parents or guardian." *Id.* at 114–15, 293 *A.*2d 181. We rejected the State's assertion that permitting the parent to be present during a recorded confession that merely repeated the statements elicited from the child during the interrogation from which the parent had been excluded was sufficient to overcome the taint. *Ibid.*

In three more recent decisions, this Court has further addressed the admissibility of confessions made by juvenile defendants. In each instance, we gave clear guidance about the manner in which the trial courts should consider the presence or absence of a parent. In *Presha*, a juvenile defendant, almost seventeen years old, and who had numerous past interactions with the criminal justice system, was brought in for questioning. *Presha, supra*, 163 *N.J.* at 308–10, 748 *A.*2d 1108. His mother was present when he waived his *Miranda* rights, but at his request,

she agreed to leave the interrogation room. *Ibid.* Her later request to reenter the interrogation room was rebuffed by police and the juvenile confessed while she was out of the room. *Ibid.*

Although in *Presha* we found that the juvenile's confession was voluntary, we took the opportunity to create specific guidelines for courts to follow when considering challenges to the voluntariness of juveniles' confessions. *Id.* at 313–17, 748 *A.*2d 1108. First, recognizing that the validity of a waiver of constitutional rights depends on whether the juvenile's will has been overborne by the police, *id.* at 313, 748 *A.*2d 1108, we reiterated the requirement that courts base their decision upon a consideration of the totality of circumstances, *ibid.* We expanded on our earlier analysis, however, by identifying factors that are relevant to the evaluation of the totality of the circumstances. These factors included " 'the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved[,]' " *ibid.* (quoting *State v. Miller,* 76 *N.J.* 392, 402, 388 *A.*2d 218 (1978)), as well as the "suspect's previous encounters with the law," *ibid.*

Second, we directed courts considering a juvenile's confession to give "enhanced weight" to the absence of a parent or legal guardian when determining whether the juvenile's waiver of rights was knowing, intelligent, and voluntary. *Id.* at 308, 748 *A.*2d 1108. We recognized that there is a "special significance" that a parent plays in a juvenile's interrogation, explaining that, "[i]n [a juvenile interrogation], the parent serves as advisor to the juvenile, someone who can offer a measure of support in the unfamiliar setting of the police station." *Id.* at 314, 748 *A.*2d 1108. Moreover, we observed that because the juvenile justice system no longer focuses solely on rehabilitating juvenile offenders, but is also the forum that determines their punishment, the parent "serves as a buffer" and can aid the juvenile in understanding his or her rights. *Id.* at 315, 748 *A.*2d 1108.

Although the juvenile in *Presha* was seventeen, we explicitly recognized that younger juveniles are in need of heightened protections when being interrogated. *Ibid.* Specifically as to juveniles under fourteen years of age, we created a presumption that if a parent is not present for the interrogation, "any confession resulting from the interrogation should be deemed inadmissible as a matter of law, unless the adult was unwilling to be present or truly unavailable." *Ibid.* Moreover, we commented that even if a parent is unwilling to be present or is truly unavailable, the police are required to "conduct the interrogation with 'the utmost fairness and in accordance with the highest standards of due process and fundamental fairness.'" *Id.* at 317, 748 *A.*2d 1108 (quoting *S.H., supra,* 61 *N.J.* at 115, 293 *A.*2d 181).

Applying these factors in *Presha,* we accorded heightened weight to the fact that the juvenile's mother was absent from the interrogation room, but found that his confession was voluntary. *Id.* at 317–18, 748 *A.*2d 1108. In particular, we looked to "defendant's age and familiarity with the criminal process, his clear desire to be interviewed without a parent present, the presence of a parent at the outset of the questioning, and his fair treatment by police ... to conclude that defendant's will was not overborne by investigators." *Id.* at 318, 748 *A.*2d 1108. We cautioned, however, that "[i]t is difficult to envision prosecutors successfully carrying their burdens in future cases in which there has been some deliberate exclusion of a juvenile's parent or legal guardian from the interrogation." *Ibid.*

We subsequently clarified this holding in the context of a juvenile who was younger than our fourteen-year-old threshold. *See Q.N., supra,* 179 *N.J.* at 173–78, 843 *A.*2d 1140. In that case, the twelve-year-old defendant was suspected of multiple sexual assaults. *Id.* at 168–71, 843 *A.*2d 1140. His mother agreed to bring him to the police department for questioning, and she was present for the administration of *Miranda* warnings. *Id.* at 169, 843 *A.*2d 1140. The detective conducting the interview then advised her to "pay attention" to the warnings in the event that

she elected to invoke her son's rights, and the juvenile and his mother both signed and initialed the waiver of rights form. *Ibid.* During the questioning, the juvenile became quiet or started to cry whenever he was specifically asked about the alleged sexual assaults. *Ibid.* The juvenile's mother responded to his crying by saying that she knew her son "did this" and by instructing him to answer the detective's questions. *Ibid.*

Less than five minutes into the interview, the detective asked the juvenile if he was embarrassed to answer questions in front of his mother, and when the juvenile said "yes," the detective next asked if the juvenile would speak to him if his mother was not in the room. *Id.* at 169–70, 843 *A.*2d 1140. The juvenile again said "yes," at which point the detective asked the mother if she would allow her son to speak with him alone. *Id.* at 170, 843 *A.*2d 1140. When the juvenile's mother agreed to leave the room and asked if she could step outside for a cigarette, the detective advised her that she needed to stay in an adjoining room to monitor the interview through a two-way mirror. *Ibid.* She was instructed to tap on the glass at any time if she had questions or wished to have the interview stopped. *Ibid.*

The juvenile was not aware that his mother was watching or that she was available to him at any time. *Ibid.* Following his mother's departure from the room, the juvenile admitted to sexually assaulting three girls. *Id.* at 170–71, 843 *A.*2d 1140. His mother was then brought back into the interview room, at which time the detective provided a second set of *Miranda* warnings and obtained a taped confession from the juvenile in his mother's presence. *Id.* at 171, 843 *A.*2d 1140.

In rejecting the juvenile's challenge to the admissibility of his confession, we explained that a parent's willingness to be absent from the interview room must be evaluated from the parent's perspective and concluded that his mother's absence from the room was a voluntary choice which met the test for unwillingness to be present. *Id.* at 174, 843 *A.*2d 1140. We reached that conclusion by an examination of the totality of the circumstances,

including the detective's "careful explanations" of the mother's rights to be present and to return or end the interview at any time, the mother's lack of hesitation when agreeing to leave and her presence during the administration of *Miranda* warnings and the initial questioning. *Id.* at 174–75, 843 *A.*2d 1140.

Those circumstances, we concluded, gave the juvenile's mother "an opportunity to assess the tenor of the police interview and the atmosphere within the interrogation room before agreeing to exit the room." *Id.* at 175, 843 *A.*2d 1140. Nevertheless, we directed police in the future to wait for the parent to offer to leave the room rather than suggesting it themselves, *id.* at 174, 843 *A.*2d 1140, and to inform the juvenile that the parent remained available even after the parent had left the room, *id.* at 177, 843 *A.*2d 1140.

Once again taking into consideration the totality of the circumstances, we concluded that the confession was voluntary. *Id.* at 175, 843 *A.*2d 1140. We cited numerous factors in explaining our conclusion, including that

[t]he questioning took place in the middle of the afternoon as opposed to an odd hour during the morning or at night. The officer used age-appropriate terms like 'private areas' to avoid confusion on the juvenile's part.... Additionally, one officer, as opposed to several officers, interacted with Q.N., lessening the impact of a police-dominated atmosphere. A related fact is that ... the officer did not raise his voice or alter his demeanor during any part of the interview....

Similarly, it does not appear that Q.N. was suffering from exhaustion or fatigue during any portion of the questioning.

Another factor supporting admissibility is that R.N. [the juvenile's mother] was present during the critical stage when the *Miranda* warnings were issued....

Not only was Q.N.'s mother present when the *Miranda* warnings were issued, she took an active role in directing her son to 'answer the officer's questions.' There is no doubt from this record that at the outset of the interview R.N. was in 'a position to assist Q.N. in understanding his rights, and in acting intelligently in waiving those rights.'

[*Id.* at 175–76, 843 *A.*2d 1140 (internal citations omitted).]

Those considerations led the Court to conclude that the juvenile was treated fairly and his statement was voluntary. *Id.* at 177–78, 843 *A.*2d 1140.

Most recently, we elaborated further on a parent's role during the interrogation of a juvenile. *See State ex rel. A.S.*, 203 *N.J.*

131, 145–52, 999 A.2d 1136 (2010). We did so in the context of a parent who was not only the parent of the juvenile accused of a sexual assault, but was also the grandparent of the alleged victim of that offense. We emphasized the importance of a parent's presence in light of "the increased emphasis being placed on punishment as a rationale underlying the juvenile justice system." *Id.* at 147, 999 A.2d 1136. Because juveniles need assistance in understanding and deciding whether to waive their rights, we held that a parent's "mere presence" in an interrogation is insufficient to safeguard a juvenile's rights. *Id.* at 148, 999 A.2d 1136. Instead, "the parent must be acting with the interests of the juvenile in mind." *Ibid.*

Although acknowledging that parents are permitted to encourage their children to cooperate with the police, *see ibid.,* we concluded that the juvenile's admissions were obtained in violation of her right against self-incrimination and directed that her confession be suppressed, *id.* at 151, 999 A.2d 1136. We reached that conclusion because the juvenile's parent was effectively serving as an agent of the police and because the juvenile was provided with conflicting and incorrect information about her constitutional rights. *Id.* at 151–52, 999 A.2d 1136.

## IV.

It is against this backdrop that we consider the several arguments advanced by the State, A.W., and ACLU–NJ to determine whether, based on the circumstances evident in this record, A.W.'s statement was given voluntarily.

## A.

Because A.W. was younger than fourteen when he was interviewed and because his father was absent when he confessed, that confession is inadmissible unless his father was unwilling to

be present.[6]  A.W. first asserts that his father's absence was inappropriately procured by the detective's use of English at critical points in the interview to marginalize his father so that he left the room without fully understanding the implications of that choice.  He buttresses this argument by pointing out that Detective Lopez had the parental waiver forms readily at hand, implying that she intended to arrange for his father to leave from the outset.

Neither of these arguments is persuasive.  The detective's use of English while A.W.'s father was in the room was brief and A.W.'s father did not request that the detective translate the few words exchanged between her and A.W. that were spoken in English.  Moreover, the vast majority of the statements that the detective made while speaking English were also spoken in Spanish either before or after that exchange.  Nor did anything in the substance of those comments serve to marginalize A.W.'s father.  In fact, the videotape shows a father who is fully engaged in listening to what his son had to say and not a man who is being excluded.  Further, the fact that the detective had forms for the parent to waive his presence in her file folder is hardly an indication that she intended to secure his absence.  Instead, it merely demonstrates that she was prepared for any eventuality that presented itself as she questioned A.W.

A.W. also argues that the detective applied subtle pressure to him, essentially asserting that she intentionally planted the suggestion in his mind that he should ask that his father leave.  He points to the detective's comment about his father being a big man

---

[6] ACLU–NJ requests that we create a new prophylactic rule that would preclude a parent from leaving an interrogation unless the parent and child first discuss the wisdom of the parent's absence directly and privately.  We decline to so direct the police.  In light of the multiple possible family dynamics that might envelop a parent and child when the child is being interrogated by police, we can envision many in which forcing the two to be alone might not be in the best interest of either.  Instead, we conclude that if a parent and child desire such an opportunity and it is denied, that fact would weigh in the balance against a finding of voluntariness.

as evidence of this subtle pressure and asks this Court to conclude that it overbore his will and improperly procured his father's absence. We do not find this assertion to be persuasive. It is telling that the detective's comment about A.W.'s father being a big man was juxtaposed with the observation that his father "was concerned" about him and about the seriousness of K.P.'s allegations. Although A.W. apparently would have this Court conclude that the reference to his father's size was a suggestion that A.W. would be in danger if his father remained or that he should be asked to leave, that notion is belied by the record. Contrary to A.W.'s contention, the videotape demonstrates the detective speaking in even and neutral tones, a juvenile in no distress, a father seated nearby, and no suggestion of any threat to the juvenile's safety or well-being.

█ We reject A.W.'s assertion that the idea that his father should leave, which he concedes was first voiced by him, came from subtle pressure exerted by the detective for another reason. As A.W. testified, the choice was the product of his own decision that he could handle the situation himself. His recognition during his testimony that he later regarded it as the wrong choice does not equate with one that was the product of coercion.

Our review of this record demonstrates that the departure of A.W.'s father from the interview room comports with several factors that this Court has previously cited as relevant to the inquiry. *See Q.N.*, *supra*, 179 *N.J.* at 174–76, 843 *A.*2d 1140. Considering the totality of the circumstances, we are convinced that A.W.'s father, having been carefully apprised of his rights and of his son's rights, and having participated in nearly half of the interview, willingly and voluntarily left the room.

Moreover, it is significant to our analysis that it was A.W. who switched to English and asked the detective if he could speak to her alone, asserting that he would tell her everything if his father left. When the detective translated that request into Spanish, A.W.'s father immediately got up to leave, then spoke directly with his son to assure himself that it was indeed his son's desire that he

be absent from the discussion of the sexual assaults on K.P. At that point, the detective stopped him from leaving and reviewed the parental waiver form with him in Spanish, stressing that she could not force him to leave the room, and advising him that he was free to return at any time.

Not only was A.W. insistent that his father leave, but he explained during his testimony at the suppression hearing that he was certain that he would be able to handle the situation alone. We see nothing in that record that calls into question his father's willingness to be absent from what was clearly a difficult discussion of sexual assaults on a very young cousin.

### B.

A.W. also challenges the voluntariness of his confession by asserting that his due process rights were violated because of the interview techniques that were utilized. He argues that the techniques used are inherently coercive and that in using them after his father left the room, Detective Lopez failed to "conduct the interrogation with 'the utmost fairness and in accordance with the highest standards of due process and fundamental fairness.'" *Presha, supra,* 163 *N.J.* at 317, 748 *A.*2d 1108 (quoting *S.H., supra,* 61 *N.J.* at 115, 293 *A.*2d 181).

We have consistently recognized that juveniles are different from adult suspects. *See, e.g., A.S., supra,* 203 *N.J.* at 149, 999 *A.*2d 1136 (noting that fourteen-year-old is "on the cusp for heightened protections because a fourteen-year-old is still of tender sensibilities and may have great difficulty withstanding the rigors of a police interrogation"); *State v. A.G.D.,* 178 *N.J.* 56, 67–68, 835 *A.*2d 291 (2003) (requiring "an added layer of protection" because "[a] young juvenile's immaturity so limits his ability to make a knowing and intelligent waiver of [his or her] rights"); *S.H., supra,* 61 *N.J.* at 114–15, 293 *A.*2d 181 (discussing impact of interrogation on juveniles and noting that "whenever possible and especially in the case of young children no child should be interviewed except in the presence of his parents or guardian"); *State*

*ex rel. Carlo,* 48 *N.J.* 224, 241, 225 *A.*2d 110 (1966) (noting that "[b]oys of 13 and 15 lack the judgment to appreciate the seriousness of the situation and the harm which they may do themselves by yielding to the pressures of insistent police questioning" and finding statements they made while their parents were repeatedly denied access to them inadmissible).

A.W. and ACLU–NJ argue that the interrogation tactics commonly used when questioning adults do not comport with due process standards when used with juveniles because of their heightened vulnerability to coercive tactics. They assert that there is a body of social science research that demonstrates that juveniles like A.W. are particularly vulnerable to such interrogation techniques and they urge us to preclude the use of these techniques in any future interrogation of juveniles.

We decline the request that we mandate which interview techniques may be used with juveniles and which may not for a very practical reason. Notwithstanding the social science materials called to our attention by A.W. and ACLU–NJ, we do not have before us the type of record that would need to be compiled to give us the basis on which to make the sweeping pronouncements that they request of us. More to the point, although it is certainly true that juveniles are more susceptible to having their wills overborne by adult authority figures, there is no evidence in this record [7] that the interview techniques deprived A.W. of any of his rights or overbore his will.

Using a totality of the circumstances approach, and considering the factors we identified in *Presha, supra,* 163 *N.J.* at 317–18, 748 *A.*2d 1108, and in *Q.N., supra,* 179 *N.J.* at 175, 843 *A.*2d 1140, we conclude that A.W.'s confession was made knowingly, intelligently,

---

[7] Our dissenting colleague's assertion that we should remand for creation of a record, following the process that led to our sweeping changes in admissibility of eyewitness identifications, *see State v. Henderson,* 208 *N.J.* 208, 27 *A.*3d 872 (2011), overlooks the fact that the videotape of this interrogation refutes every one of his assertions that this juvenile's will was overborne by the interview techniques.

and voluntarily, and that the questioning comported with the highest standards of fundamental fairness and due process. We base our decision on the totality of the circumstances demonstrated in the record and apparent from the videotape.

A.W. and his father came in voluntarily for an interview that took place during the day and that was relatively brief, lasting approximately forty-five minutes. The setting was not the intimidating environment of a police station, but instead was a brightly decorated room at the Union County Child Advocacy Center that is usually used for interviewing child victims. Detective Lopez was the only law enforcement figure present for the interview and she was dressed in plain clothes. Throughout the interview, Detective Lopez addressed A.W. respectfully using a calm, even-toned voice.

A.W.'s father was present for the first half of the interview and was involved in the review of A.W.'s rights. His father was advised of his rights in Spanish, his native language, before any questioning began and agreed to waive those rights, as did A.W.[8] His father had an ample opportunity to assess the subject matter and the tone of the questioning, to which he made no objection, before agreeing to exit the room at his son's request.

At no time was A.W. restrained in handcuffs, threatened with arrest, or otherwise intimidated. Notwithstanding A.W.'s assertions that the detective cut him off during the questioning, there is

---

[8] ACLU–NJ includes additional arguments based on the difference between the heritage and dominant languages of A.W. and his father. It suggests that *Miranda* warnings should be given in both languages and argues that A.W. may not have fully understood his rights because he had difficulty reading them in Spanish. Although rights must be read in a language that is understood, *see State v. Marquez*, 202 *N.J.* 485, 514, 998 *A.2d* 421 (2010), the record in this case does not support the assertion that A.W. did not understand his rights. The videotape of his interview reveals that he had some difficulty reading Spanish, but he testified at the suppression hearing that he understands both Spanish and English when spoken, that he reads English and, as also is clear from the videotape, he also reads some Spanish.

no evidence of the detective interrupting him when he tried to respond or otherwise failing to treat him with courtesy.

Based on our review of the record, we concur with the Appellate Division's observation that the interview was remarkable for its lack of coercion.

## V.

The judgment of the Appellate Division is affirmed.

Justice ALBIN, dissenting.

Today, the majority ignores a very real threat to the integrity of our criminal justice system—interrogation methods that increase the likelihood of false confessions and wrongful convictions among juveniles. Both social-science studies and common sense suggest that interrogation techniques that may elicit reliable confessions from adults have the high potential to elicit false confessions from children. Indeed, this case is a textbook example of the use of interrogation techniques that have the clear capacity to produce a false confession from a juvenile.

Thirteen-year-old A.W. was subjected to interrogation techniques that were just as likely to produce a false confession as a true confession. The investigating detective violated A.W.'s *Miranda* rights by insisting throughout the interrogation that he had to speak after initially telling him that he had a right to remain silent. The investigating detective violated A.W.'s rights by orchestrating the removal of the juvenile's father from the interview room, even though our jurisprudence places great emphasis on the importance of the presence of an adult during an interrogation. Last, the interrogation methods used against this thirteen-year-old, which have been known to induce even adult suspects to falsely confess, pose an unacceptably high risk of eliciting false confessions from juveniles.

Based on the present record, I am convinced that the interrogation methods employed against thirteen-year-old A.W. had the

clear capacity to overbear his will. Those methods, as applied to A.W., did not comport with " 'the highest standards of due process and fundamental fairness.' " *See State v. Presha,* 163 *N.J.* 304, 317, 748 *A.*2d 1108 (2000) (quoting *State ex rel. S.H.,* 61 *N.J.* 108, 115, 293 *A.*2d 181 (1972)). Moreover, the methods used violated this juvenile's guarantee of due process under the Federal Constitution. *See Schneckloth v. Bustamonte,* 412 *U.S.* 218, 225–26, 93 *S.Ct.* 2041, 2047, 36 *L.Ed.*2d 854, 861–62 (1972). I therefore would suppress the statement made by A.W. and remand for a new trial. I respectfully dissent.

## I.

We have long recognized that, even among mature adults, custodial police interrogations present "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona,* 384 *U.S.* 436, 467, 86 *S.Ct.* 1602, 1624, 16 *L.Ed.*2d 694, 719 (1966). Based on "mounting empirical evidence," such interrogations—by their very nature—"can induce a frighteningly high percentage of people to confess to crimes they never committed." *Corley v. United States,* 556 *U.S.* 303, 321, 129 *S.Ct.* 1558, 1570, 173 *L.Ed.*2d 443, 458 (2009) (citing Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post–DNA World,* 82 *N.C. L.Rev.* 891, 906–07 (2004)). "[W]hen the subject of custodial interrogation is a juvenile," the risk of a false confession becomes "all the more acute." *J.D.B. v. North Carolina,* 564 *U.S.* ——, ——, 131 *S.Ct.* 2394, 2401, 180 *L.Ed.*2d 310, 321 (2011) (citing "empirical studies that 'illustrate the heightened risk of false confessions from youth' " contained in amici curiae brief filed by Center on Wrongful Convictions of Youth et al.).

Significantly, a study of exonerations over a fifteen-year span indicates a striking correlation between false-confession rates and the suspect's age. *See* Samuel R. Gross et al., *Exonerations in the United States 1989 through 2003,* 95 *J.Crim. L. & Criminology*

523, 545 (2005). In juvenile cases, false confessions were found in 42% of wrongful convictions; in adult cases, false confessions were found in only 13% of wrongful convictions. *Ibid.* In cases of juveniles twelve to fifteen years of age who were exonerated of wrongful convictions, 69% had given false confessions. *Ibid.* These findings, which strongly suggest a direct correlation between a defendant's youth and susceptibility to falsely confessing, are supported by other studies. *See also* Drizin & Leo, *supra*, 82 *N.C. L.Rev.* at 944 (finding youths overrepresented in sample of false confessions with juveniles fifteen years or younger representing half of all juvenile false confessions); Joshua A. Tepfer et al., *Arresting Development: Convictions of Innocent Youth*, 62 *Rutgers L.Rev.* 887, 905 (2010) (finding false-confession rate of more than 50% in wrongfully convicted youth aged eleven to fourteen, compared to less than 17% of eighteen-year-olds and less than 10% of nineteen-year-olds).

A suspect's age already is a factor that a court must consider in determining whether a confession has been given knowingly, intelligently, and voluntarily. *Presha, supra,* 163 *N.J.* at 313, 748 *A.2d* 1108. The distinctions that the law makes between standards governing adult and juvenile interrogations are generated by "commonsense conclusions" about our understanding of "children as a class." *See J.D.B., supra,* 564 *U.S.* at ——, 131 *S.Ct.* at 2403, 180 *L.Ed.*2d at 323. The United States Supreme Court has observed that juveniles " 'generally are less mature and responsible than adults,' " *ibid.* (quoting *Eddings v. Oklahoma,* 455 *U.S.* 104, 115–16, 102 *S.Ct.* 869, 877, 71 *L.Ed.*2d 1, 12 (1982)), and " 'are more vulnerable or susceptible to ... outside pressures' than adults," *ibid.* (quoting *Roper v. Simmons,* 543 *U.S.* 551, 569, 125 *S.Ct.* 1183, 1195, 161 *L.Ed.*2d 1, 22 (2005)). Indeed, a juvenile under the age of sixteen "cannot be judged by the more exacting standards of maturity" of an adult because "[t]hat which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Haley v. Ohio,* 332 *U.S.* 596, 599, 68 *S.Ct.* 302, 304, 92 *L.Ed.* 224, 228 (1948). It is understood that "a reasonable child subjected to police questioning will sometimes

feel pressured to submit when a reasonable adult would feel free to go." *J.D.B., supra,* 564 *U.S.* at ——, 131 *S.Ct.* at 2403, 180 *L.Ed.*2d at 323.

This Court too has noted that "younger offenders present a special circumstance in the context of a police interrogation." *Presha, supra,* 163 *N.J.* at 315, 748 *A.*2d 1108. Because of the heightened vulnerability of a young juvenile, we have decreed that "when a parent or legal guardian is absent from an interrogation involving a [child under the age of fourteen], any confession resulting from the interrogation should be deemed inadmissible as a matter of law, unless the adult was unwilling to be present or truly unavailable." *Ibid.* We recognize that a parent "serves as a buffer between the juvenile, who is entitled to certain protections, and the police, whose investigative function brings the officers necessarily in conflict with the juvenile's legal interests." *Ibid.*

"[W]hen an adult is unavailable or declines to accompany the juvenile, the police must conduct the interrogation with 'the utmost fairness and in accordance with the highest standards of due process and fundamental fairness.'" *Id.* at 317, 748 *A.*2d 1108 (quoting *S.H., supra,* 61 *N.J.* at 115, 293 *A.*2d 181). The interrogation here fell far below that heightened standard intended to protect A.W.

## II.

First, Detective Lopez vitiated the *Miranda* warnings by repeatedly telling the juvenile during the interrogation that he had to speak even though he had previously been advised that he had a right to remain silent. A person subject to custodial interrogation by the police "must first be informed in clear and unequivocal terms that he has the right to remain silent" before a statement can be admitted against him. *Miranda, supra,* 384 *U.S.* at 467–68, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 720. "[S]uch a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere," and the absence of the warning requires suppression of a statement. *Id.* at 468, 86 *S.Ct.* at 1624, 16

*L.Ed.*2d at 720. A suspect also must be told that he can invoke his right to remain silent at any time during the interrogation. *Id.* at 467, 479, 86 *S.Ct.* at 1625, 1630, 16 *L.Ed.*2d at 720, 726; *State v. Nyhammer,* 197 *N.J.* 383, 400, 963 *A.*2d 316 (2009).

Case law, social-science studies, and common sense make clear that young juveniles are not fully able to comprehend the meaning of the *Miranda* warnings. *See S.H., supra,* 61 *N.J.* at 115, 293 *A.*2d 181. One study indicated that "only 21 percent of all children, as compared to 42.3 percent of adults, comprehend the meaning and significance of the *Miranda* warnings." Kenneth J. King, *Waiving Childhood Goodbye: How Juvenile Courts Fail to Protect Children from Unknowing, Unintelligent, and Involuntary Waivers of Miranda Rights,* 2006 *Wis. L.Rev.* 431, 433 (2006) (citing Thomas Grisso, *Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis,* 68 *Calif. L.Rev.* 1134, 1153 (1980)).

We have previously observed that the "[r]ecitation of the *Miranda* warnings to a boy of 10 even when they are explained is undoubtedly meaningless" because he "lacks the capability to fully understand the meaning of his rights." *S.H., supra,* 61 *N.J.* at 115, 293 *A.*2d 181. It is because a young juvenile "cannot make a knowing and intelligent waiver of something he cannot understand" that we insist that the interrogation procedure accord "with the highest standards of due process and fundamental fairness." *Ibid.* Needless to say, juveniles are especially vulnerable to interrogation methods that ride roughshod over their *Miranda* rights.

No one disputes that Detective Lopez advised A.W. of his right to remain silent before commencing with the interrogation. Indeed, she informed A.W. "that at any moment that you don't want to talk to me anymore you may stop and the interview will be ended." However, during the course of the interrogation, Detective Lopez repeatedly told A.W. that he had to speak with her, therefore contradicting and nullifying the *Miranda* warning earlier given.

Here are some of the comments made by Detective Lopez to A.W. during the interrogation that directly contradicted the earlier instruction that A.W. had a right to remain silent: "you have to tell me now because it's very important"; "if something happened, if something happened you have to tell me, it's very important"; "if this happened at least one time, you have to say it"; "you have to start being honest"; "you can't sit[ ] there and tell me that nothing happened"; "you finally realized that you had to say something"; and "I know that something else happened ... and you got to start telling me."

Detective Lopez's repeated comments to A.W. that he had to speak to her made a mockery of her earlier recitation of the *Miranda* warning that he had a right to remain silent. "A police officer cannot directly contradict, out of one side of his mouth, the *Miranda* warnings just given out of the other." *State v. Pillar*, 359 *N.J.Super.* 249, 268, 820 *A.*2d 1 (App.Div.2003); *see also State ex rel. A.S.*, 203 *N.J.* 131, 151–52, 999 *A.*2d 1136 (2010) (holding that interrogation technique that contradicted *Miranda* warning required suppression of juvenile's statement). After a detective advises the suspect that he has a right to remain silent, she should not suggest, during questioning, that he cannot remain silent. *See* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.9(c) at 827–28 (3d ed.2007) (citing examples of improper police action that negated previous assertion of *Miranda* rights).

A thirteen-year-old cannot be expected to assert his right to remain silent when the detective is repeatedly exhorting that he has to speak. With the already-deficient understanding of rights that a thirteen-year-old possesses, these flat-out contradictory statements rendered the *Miranda* warnings an empty promise and a nullity.

The inconsistent messages given to A.W. concerning his right to remain silent had the clear capacity to confuse a thirteen-year-old and lead him to the conclusion that he had no option but to speak. The detective's comments were a violation of A.W.'s Fifth Amend-

ment right against self-incrimination and rendered his confession involuntary.

### III.

A.W.'s father left the interrogation room at the suggestion of Detective Lopez and his son; the idea did not "originate" with him. The decision whether the parent should be present cannot be that of a child who—by virtue of his immaturity—lacks the capacity to exercise sound judgment concerning his best interests. A father of a thirteen-year-old should be discouraged, not encouraged, from leaving an interrogation room. After all, a juvenile "is not equal to the police in knowledge and understanding ... [and] is unable to know how to protect his own interests or how to get the benefits of his constitutional rights." *Gallegos v. Colorado,* 370 *U.S.* 49, 54, 82 *S.Ct.* 1209, 1212, 8 *L.Ed.*2d 325, 328 (1962).

In *S.H.,* we stated that "whenever possible and especially in the case of young children no child should be interviewed except in the presence of his parents or guardian." 61 *N.J.* at 114–15, 293 *A.*2d 181. Because the presence of a parent is critical to ensuring a minimum measure of protection and fair play to the juvenile, who is facing a police officer skilled in the art of interrogation, the officer is forbidden from "suggest[ing] that the parent or legal guardian depart an interrogation area." *State ex rel. Q.N.,* 179 *N.J.* 165, 178–79, 843 *A.*2d 1140 (2004). Instead, any such suggestion must "originate, *if at all,* from the accompanying adults themselves." *Id.* at 179, 843 *A.*2d 1140 (emphasis added).

A.W.'s father never raised the issue of leaving the interview room. It was a series of remarks from Detective Lopez intimating that A.W. might feel more comfortable without his father present that prompted A.W. to request his father to leave. Detective Lopez made multiple comments to A.W. about his father's presence, including the observation that "he's a big man" and "I know it's hard because your dad is here beside you." After approximately twenty-five minutes, A.W. requested that his father leave the room. A.W.'s father agreed to his son's request, signed a

waiver form, and was informed that he could return at any time. When he left the room, Detective Lopez continued to question A.W. in private. At one point during the remainder of the forty-five-minute interrogation, Detective Lopez told A.W. that she "like[d] the fact that [he] finally realized that . . . [he felt] more comfortable with [his] dad out there." It was not until after A.W. confessed that his father returned to the room.

If a child under the age of fourteen—because of his immaturity—requires the presence of a parent or guardian during an interrogation, then the child—also due to his lack of maturity—should not be able to initiate the removal of the parent from the interview room. This is so especially if the interrogating officer in any way suggests to the child that the parent should not be present.

Subtle hints to A.W. that he might feel more comfortable without his father in the room clearly violate the spirit if not the precise words of *Presha* and *Q.N.* In *Presha*, we acknowledged that, due to "immaturity and inexperience," a child under fourteen years of age is at an "obvious disadvantage . . . in confronting a custodial police interrogation." 163 *N.J.* at 315–16, 748 *A.*2d 1108 (quoting *In re B.M.B.*, 264 *Kan.* 417, 955 *P.*2d 1302, 1312 (1998)) (internal quotation marks omitted).

Detective Lopez should not have planted the suggestions that led to the removal of A.W.'s father from the interview room. She should not have asked the father to leave unless the father had initiated the move. I cannot conclude that the manner in which A.W.'s father was excluded from the interview room accorded with " 'the highest standards of due process and fundamental fairness.' " *See id.* at 317, 748 *A.*2d 1108 (quoting *S.H., supra*, 61 *N.J.* at 115, 293 *A.*2d 181).

## IV.

### A.

Last, Detective Lopez used psychological-interrogation techniques that have been known to make even adult suspects falsely

confess to crimes they did not commit. When employed against a thirteen-year-old, without a parent in the interview room, as here, the prospect of eliciting a false confession increases exponentially. That false confessions account for so many wrongful convictions should not be surprising. An admission or statement against interest made by a defendant is powerful evidence of guilt because we are predisposed to believe that an innocent person would not falsely incriminate himself.

The phenomenon of false confessions in juvenile cases has been explained through research and social-science studies. Young juveniles are peculiarly vulnerable to highly suggestive interrogation techniques. "The law enforcement community generally agrees that children are developmentally different from adults in terms of their comprehension abilities, willingness to yield to authority, and psychosocial immaturity." Tepfer, *supra*, 62 *Rutgers L.Rev.* at 917. However, when the youth in question is a suspect rather than a victim or witness, police often disregard this distinction and interrogate the suspect like an adult. *Ibid.*

By the time a suspect is interrogated, the police are no longer trying to determine whether he is guilty; rather, they are seeking to elicit a confession from a suspect "whose guilt they presume or believe they have already established." Drizin & Leo, *supra*, 82 *N.C. L.Rev.* at 911. In order to effectively "break the anticipated resistance of an individual who is presumed guilty, police interrogation is stress-inducing by design; it is intentionally structured to promote isolation, anxiety, fear, powerlessness, and hopelessness." *Ibid.* Among the psychological techniques used to interrogate suspects are:

isolation, accusation, attacks on the suspect's alibi, cutting off of denials, confrontation with true or false incriminating evidence, the use of "themes" (so-called scenarios that recast the suspect's behavior so that he is no longer morally and/or legally culpable), and inducements.
[*Id.* at 911–12.]

Those psychological-interrogation techniques are encompassed in a methodology developed in the 1940's by John E. Reid and Fred Inbau. *See* Saul M. Kassin et al., *Police–Induced Confes-*

*sions: Risk Factors and Recommendations*, 34 *Law & Hum. Behav.* 3, 7 (2010). Interrogators trained in the Reid technique employ positive and negative incentives to induce a confession. *Ibid.*

> On one hand, the interrogator confronts the suspect with accusations of guilt, assertions that may be bolstered by evidence, real or manufactured, and refuses to accept alibis and denials. On the other hand, the interrogator offers sympathy and moral justification, introducing "themes" that minimize the crime and lead suspects to see confession as an expedient means of escape.
> [*Ibid.*]

These interrogation techniques when applied to juveniles are likely to elicit an unacceptably high number of false confessions.

The Reid technique plays to the inherent weaknesses of the undeveloped child psyche—its willingness to please authority figures, its skewed cost-benefit analysis, and its lack of future orientation. *See* Jessica Owens–Kostelnik et al., *Testimony and Interrogation of Minors: Assumptions About Maturity and Morality*, 61 *Am. Psychol.* 286, 295 (2006); *see also* Neir Eshel et al., *Neural Substrates of Choice Selection in Adults and Adolescents: Development of the Ventrolateral Prefrontal and Anterior Cingulate Cortices*, 45 *Neuropsychologia* 1270, 1270–71 (2007) (explaining that brain continues to develop throughout adolescence); Laurence Steinberg et al., *Are Adolescents Less Mature than Adults? Minors' Access to Abortion, the Juvenile Death Penalty, and the Alleged APA "Flip–Flop"*, 64 *Am. Psychol.* 583, 587 (2009).

Physical isolation is intended to increase a suspect's anxiety, and confession is often presented as the only means of ending the stress-filled interrogation. Owens–Kostelnik, *supra*, 61 *Am. Psychol.* at 295. For a juvenile seeking to escape from a pressure-filled, high-anxiety interrogation, there is an increased risk that he will simply confess and tell the interrogator what she wants to hear. *Ibid.* The short-term gain for the juvenile is that he seemingly extricates himself from the immediate predicament by both pleasing and submitting to an authority figure. *See ibid.*

A juvenile also may be more likely to confess to a crime he did not commit when confronted with false evidence. *Ibid.* Even in

the case of adults, the presentation of false evidence amplifies the risk that the suspect "will confess to and internalize blame for acts they did not commit." *Ibid.* A juvenile, however, is less likely than an adult to correct misinformation provided by an authority figure, such as the police. *Ibid.*

An interrogator's refusal to accept a juvenile's repeated denials of guilt may give rise to a sense of despair and hopelessness. *See ibid.* That, combined with the interrogator's minimization of the alleged crime, may make a confession—even a false one—a more attractive alternative than engaging in seemingly futile opposition to the officer's predetermined conclusion of his guilt. *Ibid.*

In light of the unique psychological characteristics of the undeveloped mind of a young juvenile, the increased number of false confessions among juveniles is hardly surprising. Sadly, the abundance of social-science evidence detailing the alarming percentage of juvenile false confessions has not prompted law enforcement officials to utilize—or this Court to demand—age-appropriate interrogation techniques for children under the age of fourteen. At the very least, this Court's decree—that heightened standards of due process and fairness will apply to juveniles under the age of fourteen who are interrogated in the absence of a parent—should lead to an exacting scrutiny of the circumstances leading to the confession in this case.

Let us now turn to the facts of this case.

### B.

Detective Lopez, who was trained in the Reid technique, interrogated A.W. using the same psychological methods that increase the likelihood of false confessions among juveniles: (1) physical isolation from his father; (2) presentation of possibly false evidence; (3) refusal to accept A.W.'s denials while telling him that she already knew what happened; (4) minimization of the seriousness of the crime; and (5) promises of leniency if he confessed. Although any one psychological technique, standing alone, may not have been sufficient to render the confession involuntary, in their

totality they had the capacity not only to overbear the will of an isolated thirteen-year-old, but also to induce a false confession.

First, Detective Lopez successfully angled to have A.W. interviewed without a parent present, leaving the thirteen-year-old alone to resist the psychological pressures brought to bear by a skilled and trained interrogator.

Second, Detective Lopez confronted A.W. not just with evidence from the alleged victim—but also with evidence of dubious reliability. The detective told A.W. that J. had confessed and implicated him. However, Detective Lopez never directly spoke with J., and nothing in the record supports the conclusion that J. spoke with any member of the Union County Prosecutor's Office before the interrogation of A.W. The information used by Detective Lopez was received from the alleged victim's mother. No confirmation of J.'s actual statement appears in the record.[1]

Third, Detective Lopez repeatedly refused to accept A.W.'s denials of guilt. Throughout the interrogation, A.W. stated that he had not assaulted K.P. Detective Lopez made it clear that she did not accept A.W.'s declarations of his innocence. Despite his insistent denials, she told him: "I know that something happened, I know it's something, and it happened many times"; "she would never have mentioned your name if something wouldn't have happened"; "I'm not going to sit here and have you tell me something, um . . . that's not true"; "I think that you have to start being honest"; "she mentioned your name because it actually happened, okay"; "you can't sit[ ] there and tell me that nothing happened"; "you finally realized that you had to say something okay, we're progressing"; "I know that something else happened"; and "I know it already, I know it, I'm just waiting for you to tell me." After Detective Lopez's insistent refusal to accept, as true, any account given by A.W. consistent with his innocence, he confessed that on one occasion he touched the private area of K.P.

---

[1] It was just after being confronted with J.'s purported statement that A.W. requested his father leave the room.

Four, Detective Lopez minimized the seriousness of the nature of the offense that A.W. was suspected of committing. For example, she told him: "but who knows you were experimenting it one day and you touched her in the area and then you thought 'Oh my gosh I don't know why I did that'"; "[i]f something did happen, that who knows you were experimenting or who knows you did it one day but it's not something that you will do again, because it's not something that is a part of your character"; "[t]hat is something, that I know was a mistake, it's not something that you have inside your heart"; and "I'm not going to look at you differently, okay, I'm not, because I know that you are a good kid."

Five, Detective Lopez dangled before A.W. the prospect of leniency if he confessed. The detective informed A.W.: "what we try to do ... is therapy, and advice to help them so they don't do this again"; "I'm ninety nine ... point nine [percent] certain that you won't go to jail and that you won't go to juvenile"; "we're here to help you"; and "we wouldn't throw you in jail and throw away the key."

The selections above refute the majority's pronouncement that "there is no evidence in this record that the interview techniques deprived A.W. of any of his rights or overbore his will." *See ante* at 137, 51 *A*.3d at 806–07. The interrogation techniques employed in this case are powerful tools capable of overcoming even an innocent juvenile's will to resist. This Court does not have to make "sweeping pronouncements"—as suggested by the majority—to conclude that the interrogation in this case did not comport with " 'the highest standards of due process and fundamental fairness,' " *Presha, supra,* 163 *N.J.* at 317, 748 *A*.2d 1108 (quoting *S.H., supra,* 61 *N.J.* at 115, 293 *A*.2d 181). *See ante* at 137, 51 *A*.3d at 806.

This Court has held that " 'the greatest care must be taken to assure that [a] [juvenile's] admission was voluntary, ... not coerced or suggested, ... not the product of ignorance of rights or of adolescent fantasy, fright or despair.' " *A.S., supra,* 203 *N.J.* at

151–52, 999 *A*.2d 1136 (second alteration in original) (quoting *In re Gault*, 387 *U.S.* 1, 55, 87 *S.Ct.* 1428, 1458, 18 *L.Ed.*2d 527, 561 (1967)). That care was not taken in this case. Nor did Detective Lopez's interrogation methods accord with the due-process guarantee protecting this juvenile under the Federal Constitution. *See Schneckloth, supra*, 412 *U.S.* at 225–26, 93 *S.Ct.* at 2047, 36 *L.Ed.*2d at 861–62. For these reasons, I would suppress the confession in this case.

I understand that the majority is not satisfied with the manner in which the social-science evidence has been presented in this case. But, if that is so, this Court should remand the matter to the trial court or a special master for the preparation of an appropriate record, as we did in *State v. Henderson*, 208 *N.J.* 208, 228–30, 27 *A*.3d 872 (2011).

## V.

The law too often fails to keep pace with developments in science. We came to that conclusion recently in *Henderson* when we recognized that the legal standards governing the admissibility and use of identification evidence lagged far behind the findings of numerous studies in the social sciences. *See id.* at 285–87, 27 *A*.3d 872. We adjusted our legal standards to address the real-world problem that misidentifications lead to too many wrongful convictions. *See id.* at 288–93, 27 *A*.3d 872.

In this case, we have a substantial number of social-science studies that reveal the heightened risk of false confessions from interrogation methods that make children compliant with their interlocutors. But regrettably, the Court will not address the problem for now.

The one outcome that is anathema to our criminal justice system is the conviction of the innocent. Our system is not perfect; even when all our procedural protections are in working order, occasional miscarriages of justice will occur. We should not turn a blind eye to the substantial evidence that interrogation techniques used against juveniles may be just as likely to produce

false confessions as true confessions. Tolerance of interrogation methods that produce an unacceptably high number of false confessions—confessions that result in wrongful convictions—is not a judicial policy that promotes justice.

Finally, I believe that in upholding the conviction of A.W., the majority abandons decades of jurisprudence that gave special protection to a young juvenile stranded alone in an interview room with a highly trained police interrogator. A commonsense reading of the interrogation transcript in this case leads to the conclusion that Detective Lopez fatally undermined A.W.'s *Miranda* right to remain silent; his right to the presence of a parent, even if contrary to the child's own misguided perception of his best interests; and his right to be accorded the "utmost fairness" during his interrogation.

For these reasons, I respectfully dissent.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, HOENS and PATTERSON—4.

*For reversal*—Justice ALBIN—1.

*Not Participating*—Justice WEFING (temporarily assigned)—1