NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2694-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ALBERTO LOPEZ, a/k/a
ALBERTO LOPEZ, III,
ALBERTO A. LOPEZ,
ALBERTO C. LOPEZ,
and CHOPPY,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
> **AS REDACTED**
>
> **July 15, 2022**
>
> **APPELLATE DIVISION**

Argued February 15, 2022 – Decided July 15, 2022

Before Judges Sabatino, Mayer and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 15-01-0014.

Douglas R. Helman, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Douglas R. Helman, of counsel and on the brief).

Taylor S. Hicks, Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Taylor S. Hicks, of counsel and on the brief).

The opinion of the court was delivered by

NATALI, J.A.D.

After he was waived to the Law Division to be tried as an adult, a jury convicted defendant Alberto Lopez of murder, felony murder, and robbery – three first-degree offenses – along with two second-degree weapons charges. The jury's verdict was based, in part, on the testimony of an eyewitness who saw defendant shoot the victim in the head during a drug transaction, a murder he committed when he was sixteen years old.

After merger, the court sentenced defendant to an aggregate forty-two-year custodial term, subject to an 85% period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and a concurrent five-year term with respect to one of the weapons offenses. Before us, defendant raises the following arguments:

> I. THE RULING THAT [DEFENDANT]'S STATEMENT, ELICITED IN VIOLATION OF HIS SIXTH AMENDMENT AND STATUTORY RIGHTS TO COUNSEL, WAS ADMISSIBLE TO IMPEACH HIM, IMPERMISSIBLY IMPINGNED UPON [HIS] RIGHT TO TESTIFY IN HIS OWN DEFENSE. REVERSAL IS REQUIRED.
>
> II. THE COMPLETE LACK OF ANY JURY CHARGE ON IDENTIFICATION – WHEN THE STATE'S ENTIRE CASE HINGED UPON THE EYEWITNESS TESTIMONY OF ONE INDIVIDUAL– DEPRIVED [DEFENDANT] OF A FAIR TRIAL, REQUIRING REVERSAL.

A. A Jury Instruction on the State's Burden to Prove Identity was Required.

B. The Court Also Failed to Give the Required Instruction on the Reliability of Eyewitness Identifications.

III. THE JUDGE LEFT OUT A CRITICAL PORTION OF THE ROBBERY CHARGE CONCERNING INTENT AND THE USE OF FORCE, REQUIRING REVERSAL, BUT IN ANY EVENT, THERE WAS INSUFFICIENT EVIDENCE OF THE INTENT ELEMENT FOR ROBBERY. THE MOTION FOR ACQUITTAL ON COUNTS II AND III SHOULD HAVE BEEN GRANTED.

IV. DETECTIVE MCNALLY'S INVOCATION OF A NON[-]TESTIFYING WITNESS, AND HIS TESTIMONY ON THE QUALITY OF THE STATE'S EVIDENCE AND THE CREDIBILITY OF THE STATE'S WITNESSES, VIOLATED [DEFENDANT]'S RIGHTS TO CONFRONTATION, THE HEARSAY RULES, AND CONSTITUTED IMPROPER LAY OPINION IN VIOLATION OF N.J.R.E. 701 and 702. THIS IMPROPER TESTIMONY WAS COMPOUNDED IN THE PROSECUTOR'S CLOSING STATEMENT. REVERSAL IS REQUIRED.

V. THE CUMULATIVE IMPACT OF THESE ERRORS DENIED [DEFENDANT] A FAIR TRIAL.

VI. [DEFENDANT]'S 42-YEAR SENTENCE VIOLATED THE PRINCIPLES OF <u>MILLER V. ALABAMA</u> AND IS ALSO INDEPENDENTLY EXCESSIVE.

After considering the record against the applicable standards of review and legal principles, we affirm defendant's convictions and sentence.

I.

We discern the following facts from the evidence adduced at trial. On December 18, 2013, two Trenton police officers responded to a "man down" and "shots fired" report at a location near the police department. Upon arriving at the scene, the police immediately noticed the victim, Shamere Melvin, on the ground with a fatal gunshot wound to his head. They also observed a single bullet shell casing near his body.

Melvin was pronounced dead at the scene. Later that night, a police officer contacted Detective Robert McNally of the Mercer County Prosecutor's Office and advised him that Alyssa Simmons, a juvenile, arrived at the police station and stated she had information regarding the Melvin homicide. Detectives McNally and Anthony Abarno thereafter obtained statements from Simmons and her friend, Allyson Keil.

Based on those statements, and other evidence developed during the investigation, the detectives learned that at defendant's request, Keil reached out to multiple drug dealers to purchase one ounce of marijuana with the promise that he would share the marijuana with her. Keil discussed the potential drug deal with "around [ten]" people by telephone and text message. Keil also posted

A-2694-18

4

a Facebook message asking if any of her friends had marijuana for sale, to which Melvin responded and offered $700 for two ounces. Keil testified this was the highest price proposed with $100 per ounce the lowest offer. She also stated that she relayed information on each dealer to defendant by Facebook message and telephone, and defendant asked questions about where each dealer lived, their appearance, and age.

Keil then reached out to Simmons, who drove her and defendant to Trenton to purchase the drugs from Melvin. Simmons and Keil testified they drove with defendant, who Simmons knew as "Choppy" from middle school, and another individual who both girls assumed was defendant's cousin, known as "Mooch." Simmons stated Mooch wore a ski mask, a blue hoodie and blue jeans, and she could only see his eyes. Keil similarly testified that Mooch wore "a dark hoodie, dark pants . . . [and] had a mask on."

Simmons stated that once the group arrived to meet Melvin, Keil got out of the car and hugged him. Keil explained she spoke briefly and in a friendly manner with Melvin because she knew him from school, but defendant called her back to the car and told her "he did not want to do [the deal] anymore [because] there [were] too many people [around]." Simmons likewise stated that she remembered defendant and Mooch quickly returning to the car after

Keil first got out because the area was too "suspicious," and there were too many people at the location.

Keil noted that while they were driving to a new location, defendant called Melvin and told him that he "didn't want to do [the deal] unless he was by himself." After driving a few blocks, defendant and Mooch saw Melvin, who was with a friend. Keil stated that she heard Melvin tell his friend to "go and stand by the corner" and at that point, defendant and Mooch got out of the car and walked toward Melvin "about a house length away" from the car.

While looking through the mirror as she was seated in the driver's seat, Simmons testified she saw defendant shoot Melvin. Although it was dark outside, she stated that there were "a lot of streetlights," and that she saw "a flash and [Melvin] drop[] to the ground." For her part, Keil testified she was seated in the backseat and heard a "pop," and turned around to see Melvin's "body on the floor" and defendant rummaging through his pockets. She stated that she then watched defendant, with a gun in his hand, take marijuana from Melvin's pockets while Mooch ran in the opposite direction.

In their initial statements, both Simmons and Keil acknowledged they were in the car with defendant, stopped so he could purchase marijuana from Melvin, and saw a flash and heard the "pop of a gun," but stated they could not be sure if it was defendant that pulled the trigger. Simmons and Keil, however,

gave later statements in which they identified defendant as the person who shot Melvin. At trial, Simmons testified that she was certain defendant was the person she saw shoot Melvin, and acknowledged she neglected to identify defendant in her earlier statement to detectives, but attributed that omission to being "scared" and not wanting "anything to happen to [her] family or [her]self."

As part of her later statement, Keil also informed detectives that she saw defendant rummage through Melvin's pockets and steal the marijuana. Keil testified that she did not tell detectives about the theft in her initial statement because she was sixteen "at the time, [she] was scared, and [she] was scared she was going to get charged, too."

Simmons stated that after the shooting she drove off "hysterical," and once she composed herself in a parking lot, drove to her friend Alyssa Parvesse's house. Because Parvesse was not home, Simmons and Keil drove to Simmons' house and waited for Parvesse to pick them up. After she arrived, Parvesse drove Keil home, and dropped Simmons at her aunt's house, where her mother was staying. Both Simmons and Keil informed their parents of what had occurred and then proceeded to the police station.

Parvesse testified at trial and stated that she declined Keil's request to drive her to Trenton to buy marijuana with defendant. Parvesse also explained that once Keil and Simmons arrived at her house, they told her that they saw

"Choppy" shoot Melvin. Parvesse told police that she had warned Simmons earlier in the evening about her suspicion that Keil and her friends were planning a robbery. Parvesse also testified as to Simmons' and Keil's emotional states, describing Simmons as "really scared and shaking and crying" and Keil behaving "like a shocked person."

Defendant was arrested and charged in the Family Part with first-degree murder, N.J.S.A. 2C:11-3(a)(1); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). He was orally informed of his Miranda[1] rights with his parents present, and they signed a consent form for an interview. Despite being a minor and formally charged, the police obtained a separate signed waiver of defendant's Miranda rights and elicited a statement from him without counsel present.

In his recorded statement, defendant denied killing Melvin, and stated he only approached him to purchase marijuana. Defendant further insisted that his cousin was not with him that evening, and that he came by himself with Keil and Simmons. When he arrived, defendant stated that he got out of the car to meet Melvin, and saw an unknown individual with a black hoodie cross the street and walk towards them. Believing this individual was about to rob him,

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

defendant explained he began "backing up," and when he turned around and began to run, "all [he] heard was gun shots." Shocked and afraid, defendant said he fled the scene after Keil and Simmons left in the car.

The State moved for involuntary waiver of jurisdiction pursuant to N.J.S.A. 2A:4A-26 and Rule 5:22-2. The court granted the motion and waived defendant's case to the Law Division. In doing so, the court concluded the State established probable cause that defendant committed criminal homicide, one of the enumerated offenses under N.J.S.A. 2A:4A-26.1(c)(2), and more specifically, murder as defined by N.J.S.A. 2C:11-3.

Defendant was thereafter indicted by a grand jury on first-degree murder (count one); first-degree felony murder, N.J.S.A 2C:11-3(a)(3) (count two); first-degree robbery, N.J.S.A 2C:15-1 (count three); second-degree possession of a weapon for an unlawful purpose (count four); and second-degree unlawful possession of a weapon (count five).

Defendant filed a number of pretrial motions. As relevant to the issues before us, he moved to dismiss count two of the indictment and to amend count three from robbery to theft, relying primarily upon State v. Lopez, 187 N.J. 91, 101-02 (2006), claiming that because any theft occurred after the use of force, he did not possess the requisite intent sufficient to support the robbery count. The court denied defendant's motion and distinguished Lopez by concluding that

the State presented sufficient circumstantial evidence to establish defendant possessed "an intent to steal from Melvin . . . [that was] formed prior to or contemporaneous with his shooting."

Defendant also filed an application to suppress his statement to the police for all purposes, reasoning that it had been taken without counsel present, contrary to State in the Interest of P.M.P., 200 N.J. 166, 178 (2009) (holding that juveniles may not waive their Miranda rights without counsel present once a formal complaint has been lodged). The State conceded that defendant's statement was obtained contrary to his Sixth Amendment rights and therefore agreed that it could not use his statement its case-in-chief. The State argued, however, that based on State v. Burris, 145 N.J. 509, 533 (1996), defendant's statement was trustworthy and voluntary, and as such, it could still be used to impeach him should he testify.

The court rejected defendant's application and explained that although the statement was inadmissible in the State's case-in-chief, the State was permitted to use the statement for impeachment purposes, subject to a finding that the statement was voluntary and trustworthy, as well as any concerns regarding undue prejudice. The court distinguished P.M.P., 200 N.J. at 178, reasoning defendant had been waived to adult court, unlike the juvenile in that case. After defendant and his counsel conferred, his counsel "concede[d] that the statement

[defendant gave to Detectives McNally and Abarno] was voluntary," and as such, there was no need for a N.J.R.E. 104 hearing on the issue. The court confirmed that "in effect, if [defendant] decides to take the witness stand, he is acknowledging he can be cross-examined with that prior statement?" and defense counsel stated that was accurate.

At trial, Sergeant Brian Jones of the Trenton Police Department testified that he arrived at the scene to find a "man down on the sidewalk" and discovered that the victim had suffered a gunshot wound to the head. He also stated that he found only one "shell casing in close proximity to the victim," who he identified as Melvin. A second officer, Sergeant Paul Toth, explained that an inventory conducted as part of Melvin's autopsy revealed he had five one-dollar bills in his pocket and a wallet, but no marijuana.

Dr. Lauren Thoma, the Middlesex County Medical Examiner, also testified for the State, and stated that Melvin's cause of death was a single gunshot wound to the head. Because there was no evidence of gunshot residue, Dr. Thoma testified that the wound was a "distant wound," that likely occurred from "not less than several feet away," but it could be up to twenty or thirty feet away.

Finally, Detective McNally stated that he spoke with several people at the scene, who heard the gunshot from their homes. Detective McNally also

testified with respect to records obtained from Facebook in the course of the investigation. The detective explained that the police identified defendant's Facebook account, which was registered under the name "Chop Ice," but after obtaining a warrant to review records from that account, defendant did not have any "Facebook messages going back and forth with anybody." In contrast, Detective McNally indicated that Melvin's Facebook records for the same time period showed "in excess of 500 pages" of messages.

Detective McNally explained that he also obtained Facebook records for Keil for the same time period. When asked why the defendant's account did not reveal any messages, the detective explained that he believed the messages had been deleted because after speaking with Keil, who informed police she communicated with defendant via Facebook messenger, "the majority of all her messages that she had told [police] she had been communicating with were on her pages, but yet none of those messages were on [defendant's] pages."

On direct examination, Detective McNally also stated that he spoke with Jabree Green, Melvin's friend, but that Green told detectives he did not witness the murder and was not willing to give a formal statement. Green did tell Detective McNally, however, that he had been with Melvin earlier in the evening near the scene of the murder, when Melvin "walked off and said he'd be back in about [ten] or [fifteen] minutes," but when he heard a gunshot, Green ran up the

block and turned the corner to find Melvin lying on the ground. Detective McNally stated that he tried to speak with Green various times over the years, but Green was uncooperative, even though the police believed he had been a witness.

On cross-examination, defense counsel asked Detective McNally about his interview with Green. In response, Detective McNally again stated that Green told him "he did not witness [the murder] and was not present." Defense counsel also asked Detective McNally about the forensic evidence recovered. Detective McNally testified that law enforcement never recovered a gun, and there was no DNA or fingerprint evidence linking defendant to the murder.

At the close of the State's case, defendant made a motion for judgment of acquittal, arguing that there was insufficient evidence under State v. Reyes, 50 N.J. 454, 458-59 (1967), to support a conviction. The court denied the motion, concluding that based on the evidence introduced at trial, a reasonable jury could find that defendant purposely or knowingly shot Melvin, and could further infer that "defendant formed [the] intent to steal the marijuana even before he shot and killed [Melvin]."

The court charged the jury consistent with the parties' requests and in accordance with the Model Jury Charges (Criminal). The jury deliberated for

several days, and after requesting a playback of Simmons' testimony and parts of Keil's testimony, found defendant guilty on all counts.

At sentencing, the court merged counts two, three and four into count one and imposed a forty-two-year sentence subject to NERA after applying aggravating factors three, six and nine. See N.J.S.A. 2C:44-1(a)(3)(6) and (9). The court did not find any mitigating factors applicable, but concluded that factors one, two and five under Miller v. Alabama, 567 U.S. 460, 478 (2012), as adopted by our Supreme Court in State v. Zuber, 227 N.J. 422, 429 (2017), weighed in defendant's favor. The court also sentenced defendant to a separate five-year custodial term as to count five with a three-and-one-half period of parole ineligibility, ran the sentences concurrently, and imposed applicable fines and penalties. This appeal followed.

II.

In his initial point, defendant argues that the court incorrectly ruled that his statement to Detectives McNally and Abarno could be used for impeachment purposes, despite the State's concession that it was elicited in violation of defendant's Sixth Amendment rights, and in doing so, "placed an impermissible burden on his right to testify in his own defense." He supports his argument on three separate, but related, bases.

He first contends, relying on United States v. Brown, 699 F.2d 585 (2d Cir. 1983), and People v. Gonyea, 421 Mich. 462 (1984), that the court improperly relied on Burris, as that holding was grounded on violations of the Fifth Amendment. As such, any attendant "voluntariness" inquiry would be structurally inapplicable to a Sixth Amendment violation like that committed by Detectives McNally and Abarno. Second, defendant maintains the court's decision is contrary to our State's robust Sixth Amendment jurisprudence which has relied on our Constitution to provide citizens with greater protections than those afforded under the Federal Constitution. Third, he argues the court's decision is contrary to New Jersey statutory authority and Supreme Court precedent that provides juveniles with "special protections" when subject to interrogation. State ex rel. A.W., 212 N.J. 114, 128 (2012). We disagree with all these arguments.

We apply a de novo standard of review in construing the "meaning of a constitutional provision or a statute." Gormley v. Wood-El, 218 N.J. 72 (2014). Under that plenary analysis, we do not defer to the court's interpretation of the Sixth Amendment. Id. at 87.

As noted, because his statements were elicited in violation of his Sixth Amendment right to counsel, defendant contends that the statements may not be admitted under any circumstances, including impeachment. Defendant argues

that the impeachment exception noted in <u>Burris</u> applied only to violations of the Fifth Amendment, and not to the Sixth Amendment violation at issue here.

In <u>Burris</u>, the Court held that a statement taken in violation of the Fifth Amendment privilege against self-incrimination, though inadmissible in the prosecution's case-in-chief, is nonetheless admissible for impeachment purposes. <u>Burris</u>, 145 N.J. at 529. Before admission, however, the statement must be found to be "trustworthy and reliable in that it was given freely and voluntarily without compelling influences." <u>Id.</u> at 525.

Defendant argues the <u>Burris</u> rule has no application when the police violated a defendant's Sixth Amendment rights, and as noted, cites <u>Brown</u>, 699 F.2d at 587 and <u>Gonyea</u>, 421 Mich. at 462, in support. In those cases, both courts precluded the government from introducing defendant's uncounseled, post-indictment statements for any purpose, including impeachment. <u>Brown</u>, 699 F.2d at 590; <u>Gonyea</u>, 421 Mich. at 480-81. We disagree and note that <u>Brown</u> and <u>Gonyea</u>[2] are not accurate reflections of the current state of the law on the issue.

---

[2] We note that <u>Gonyea</u> was a plurality decision of the Michigan Supreme Court, and since then, relying on <u>Michigan v. Harvey</u>, 494 U.S. 344, 349 (1990), the Michigan Court of Appeals has held that a defendant's statements elicited in violation of his Sixth Amendment right to counsel, though inadmissible as substantive evidence, were admissible for impeachment purposes. <u>People v. Frazier</u>, 270 Mich. App. 172, 182 (2006), <u>rev'd on other grounds</u>, 478 Mich. 231

In Harvey, 494 U.S. at 349, the United States Supreme Court first held that a statement obtained from a defendant in violation of the Sixth Amendment could be used to impeach his inconsistent testimony at trial. The Court expanded on this ruling in Kansas v. Ventris, 556 U.S. 586, 592 (2009), when it held that the violation of the Sixth Amendment right to counsel is infringed at the time of the uncounseled interrogation, and that voluntary statements obtained in violation of a defendant's Sixth Amendment right to counsel were admissible to impeach a defendant's inconsistent testimony at trial. In doing so, Justice Antonin Scalia explained:

> Whether otherwise excluded evidence can be admitted for purposes of impeachment depends upon the nature of the constitutional guarantee that is violated. Sometimes that explicitly mandates exclusion from trial, and sometimes it does not. The Fifth Amendment guarantees that no person shall be compelled to give evidence against himself, and so is violated whenever a truly coerced confession is introduced at trial, whether by way of impeachment or otherwise. The Fourth Amendment, on the other hand, guarantees that no person shall be subjected to unreasonable searches or seizures, and says nothing about excluding their fruits from evidence; exclusion comes by way of deterrent sanction rather than to avoid violation of the substantive guarantee. Inadmissibility has not been automatic, therefore, but we have instead applied an exclusionary-rule balancing test. The same is true for violations of the Fifth and Sixth Amendment

(2007). On appeal, the Michigan Supreme Court did not disturb this holding, and has not since ruled on the issue. People v. Frazier, 478 Mich. 231, 235 (2007).

A-2694-18

17

> prophylactic rules forbidding certain pretrial police conduct.
>
> [<u>Ventris</u>, 556 U.S. at 590-91 (internal citations omitted).]

Applying that balancing test, Justice Scalia reasoned that suppressing statements obtained in violation of the Sixth Amendment right to counsel for impeachment purposes would be an improper remedy for the constitutional violation, and would provide defendant "with a shield against contradiction of his untruths." <u>Id.</u> at 594 (quoting <u>Walder v. U.S.</u>, 347 U.S. 62, 65 (1954)). Justice Scalia further explained the "need to prevent perjury and to assure the integrity of the trial process" outweighed any interest in excluding the statements. <u>Ibid.</u> (quoting <u>Stone v. Powell</u>, 428 U.S. 465, 488 (1976)).

Accordingly, the <u>Ventris</u> Court saw no reason to expand the exclusionary rule, finding no additional deterrent motivations for police to avoid obtaining statements that might be later used for impeachment. <u>Ventris</u>, 556 U.S. at 593. As Justice Scalia explained, "[a]n investigator would have to anticipate both that the defendant would choose to testify at trial (an unusual occurrence to begin with) <u>and</u> that he would testify inconsistently despite the admissibility of his prior statement for impeachment." <u>Ibid.</u> (emphasis in original). These circumstances are not likely to occur, "or at least not likely enough to risk squandering the opportunity of using a properly obtained statement for the prosecution's case-in-chief." <u>Ibid.</u>

The majority of circuit courts have similarly held that statements obtained in violation of a defendant's Sixth Amendment right to counsel may be used for impeachment purposes. See Gardner v. Galetka, 568 F.3d 862, 875 (10th Cir. 2009) (Defendant is not licensed "to perjure himself without threat of refutation using his prior statements," even if the elicitation of those statements violated defendant's rights under the Fifth and Sixth Amendments.); United States v. Danielson, 325 F.3d 1054, 1067 (9th Cir. 2003), as amended (May 19, 2003) (Any statements gathered in violation of defendant's Sixth Amendment right to counsel "must be excluded from the government's case-in-chief, although 'they are admissible to impeach conflicting testimony by the defendants,' provided the statements were voluntary.") (quoting Harvey, 494 U.S. at 349-53 (1990)).[3]

---

[3] See also United States v. Fellers, 397 F.3d 1090, 1097 (8th Cir. 2005) (allowing defendant's "uncounseled statements obtained in violation of the Sixth Amendment [to] be used at trial for impeachment purposes"); McGriff v. Dep't of Corr., 338 F.3d 1231, 1236 (11th Cir. 2003) (addressing the right to counsel under the habeas corpus statute, but noting "statements obtained in violation of a defendant's Fifth or Sixth Amendment right to counsel cannot be used in the prosecution's case-in-chief against the defendant, but may be used for impeachment purposes"); United States v. Bender, 221 F.3d 265, 271 (1st Cir. 2000) (stating that the government was not precluded from using defendant's incriminating statements, obtained in violation of his Sixth Amendment rights, "if knowing and voluntary, for the purpose of impeachment, if he testifies"); United States v. Laury, 49 F.3d 145, 150 (5th Cir. 1995) ("It is well established that the prosecution may use a statement obtained in violation of the Sixth Amendment to impeach a defendant's false or inconsistent testimony."); United States v. Lott, 854 F.2d 244, 249 (7th Cir. 1988) (Defendant's testimony obtained in violation of his Sixth Amendment right to counsel was admissible

Based on the aforementioned authority, we are satisfied that the court did not err when it concluded that defendant's statements to detectives were admissible to impeach him should he testify. We acknowledge that <u>Ventris</u> and <u>Harvey</u> were based upon rights enumerated by the Federal Constitution, and as our Supreme Court has recently re-emphasized, the United States Constitution

---

for impeachment purposes at trial because "[t]o hold otherwise would pervert [defendant]'s Sixth Amendment right to counsel into a right to commit perjury.").

Numerous state courts have also concluded that statements obtained in violation of the Sixth Amendment may be admitted for impeachment purposes. See <u>Phillip v. State</u>, 225 P.3d 504, 514 (Wyo. 2010) ("[E]ven if the evidence was unlawfully obtained because a defendant's right to counsel was not properly observed, the evidence may still be used for impeachment purposes."); <u>People v. Brown</u>, 42 Cal. App. 4th 461, 463-74 (1996) (holding "that the exclusion of a defendant's voluntary statements, obtained in violation of the Sixth Amendment right to counsel, from the case-in-chief sufficiently vindicates the defendant's Sixth Amendment rights," and explaining that "when the defendant takes the stand and testifies inconsistently with those statements, protection of the truth-finding purpose of a criminal trial requires that such statements be admissible for impeachment"); <u>State v. Mattatall</u>, 603 A.2d 1098, 1114-15 (R.I. 1992) ("In no way should the exclusionary rules enunciated by the Supreme Court . . . be perverted by any defendant into a license to commit perjury."); <u>Com. v. Batson</u>, 396 Pa. Super. 513, 517 (1990) (relying on <u>Harvey</u> and holding that a statement made by appellant that was "given voluntarily and of free will" could not be admitted in the prosecution's case-in-chief, but was amissible for impeachment purposes); <u>Martinez v. United States</u>, 566 A.2d 1049, 1059 (D.C. 1989) (holding that "a voluntary statement obtained in violation of a defendant's Sixth Amendment right to counsel may be used at trial to impeach the contrary or inconsistent testimony of that defendant"); <u>State v. Swallow</u>, 405 N.W.2d 29, 39 (S.D. 1987) ("While we agree that the right to counsel is of great importance to our system of justice, we do not believe that this right should be contorted into a rule that would effectively countenance perjury.").

A-2694-18

20

"provides the floor for constitutional protections, and our own Constitution affords greater protection for individual rights than its federal counterpart." State v. Melvin, 248 N.J. 321 (2021).

For example, New Jersey provides greater protection from unreasonable searches and seizures than does the Fourth Amendment, see State v. Carter, 247 N.J. 488, 529-30 (2021), from self-incrimination than does the Fifth Amendment, see State v. O'Neill, 193 N.J. 148, 176-77 (2007); and from cruel and unusual punishment in the context of the Eighth Amendment, see Zuber, 227 N.J. at 438. In the context of the Sixth Amendment, we have clarified that "[w]here the language of our State Constitution contains similar language, as Article I, paragraph 10 does regarding the Sixth Amendment, there should be some intent or historical support for the proposition that our drafters were providing something different than the drafters of the federal constitution." State v. Daniels, 364 N.J. Super. 357, 371 (App. Div. 2003), rev'd on other grounds, 182 N.J. 80 (2004).

Relying on these principles generally, and on State v. Sanchez, 129 N.J. 261, 275 (1992) specifically, defendant argues that in New Jersey, "a right to counsel violation after indictment implicates a state-based right which preceded the Sixth Amendment, and thus, demands an even higher waiver standard." In Sanchez, the defendant moved to suppress his uncounseled, post-indictment

confession, arguing that it violated his Sixth Amendment right to counsel, even though he had been read his <u>Miranda</u> rights and signed a waiver form.  <u>Id.</u> at 262.  The trial court admitted the statement, concluding that defendant had never requested counsel, and he made a knowing and voluntary wavier of his rights. <u>Ibid.</u>  We affirmed.

Our Supreme Court reversed, and declined to apply the United States Supreme Court's holding in <u>Patterson v. Illinois</u>, 487 U.S. 285, 298 (1988), that "<u>Miranda</u> warnings adequately alert an accused of the right to counsel and of the consequences of a decision to waive his or her Sixth Amendment rights during post-indictment questioning."  The <u>Sanchez</u> Court noted that New Jersey has long protected a broader right to counsel than the Federal Constitution and emphasized New Jersey's "traditional commitment to the right to counsel."  <u>Id.</u> at 274-75.  The Court reasoned that the indictment "transforms the relationship between the State and the defendant" and begins a stage of the proceedings in which the "prosecutor and the defendant are adversaries."  <u>Id.</u> at 276.

As such, the court concluded, "the perfunctory recitation of the right to counsel and to remain silent may not provide the defendant with sufficient information to make a knowing and intelligent waiver" because these warnings do not inform the defendant of "the nature of the charges, the dangers of self-representation, or the steps counsel might take to protect the defendant's

interests." Id. at 276-77. The Court determined that "[a]s a general rule, after an indictment and before arraignment, prosecutors or their representatives should not initiate a conversation with defendants without the consent of defense counsel." Id. at 277.

We are not persuaded that the holding in Sanchez, or the other authority cited by defendant, supports his argument that the violation of defendant's right to counsel under Article 1, paragraph 10 of the New Jersey Constitution, or the Sixth Amendment, required his statement to be excluded for all purposes, including impeachment. We reach that conclusion because we agree with the Ventris Court's reasoning that "preventing impeachment use" of defendant's statement "would add little appreciable deterrence" to police conduct. Id. at 593.

Our conclusion is further supported by the fact that no New Jersey court of which we are aware has so broadly interpreted a defendant's Sixth Amendment rights to effectively allow an accused to lie affirmatively regarding a non-coerced statement without permitting the State the opportunity to engage in direct impeachment. That principle is particularly relevant here: if defendant's statement, which his counsel stipulated was entered voluntarily, was barred from use at trial for all purposes, defendant could conceivably take the witness stand and blame the murder on Mooch, and not the unidentified, mysterious, hooded man who he told detectives emerged from the darkness to

kill the victim for no known purpose. Under defendant's proposed interpretation of the Sixth Amendment, the State would be without recourse to confront him directly with the most damaging evidence against him on that point—his own statement.

Nor, in our view, does defendant's juvenile status compel a contrary result. In reaching this conclusion, we fully acknowledge that our State has "long accorded juveniles special protections when they are subjected to [custodial] interrogation." State ex rel. A.W., 212 N.J. 114, 128 (2012). We do so because juveniles are "typically less mature, often lack judgment, and are generally more vulnerable to pressure than adults," great care must be taken to ensure a juvenile's statement is voluntary, and "'not the product of ignorance of rights or of adolescent fantasy, fright or despair.'" State In Int. of A.A., 240 N.J. 341, 354 (2020) (quoting In re Gault, 387 U.S. 1, 55 (1967)).

In particular, "a parent or legal guardian should attend a juvenile interrogation whenever possible to help assure that any waiver of rights by the juvenile is the product of free will." State v. Presha, 163 N.J. 304, 322 (2000). This is so because a parent "can offer a measure of support in the unfamiliar setting of the police station." Id. at 314. If an adult is unavailable or declines to accompany the minor, police must conduct an interrogation "'in accordance with the highest standards of due process and fundamental fairness.'" Id. at 317

(quoting State ex rel. S.H., 61 N.J. 108, 115, (2004)).  In the context of the Fifth Amendment, courts must consider the "totality of the circumstances" in evaluating the voluntariness of a juvenile's statement, and the presence of a parent is an important factor in that determination.  Id. at 321.

Our courts further recognize "the profound importance of a decision to waive a minor accused of an offense to the adult criminal court" due to "the fundamental difference between juvenile courts that focus on rehabilitation of youths and adult criminal courts that are more focused on deterrence and punishment."  State in Int. of E.S., 470 N.J. Super. 9, 17 (App. Div. 2021).  Juveniles are entitled to various procedural protections before waiver to adult court, and must "receive a hearing, effective assistance of counsel who have access to relevant information, and a statement of reasons for the court's decision."  State in Int. of N.H., 226 N.J. 242, 253 (2016).  Indeed, at these hearings, juveniles are afforded "greater rights than adults have at comparable probable cause hearings."  Ibid.

Further, the waiver process is carefully crafted to ensure juveniles who commit only enumerated delinquent acts are tried in adult court, see N.J.S.A. 2A:4A-26.1(c)(2), and has recently been revised to require even greater protections for juveniles.  In 2016, the Legislature raised the minimum age for eligibility for waiver from fourteen to fifteen, see N.J.S.A. 2A:4A-26.1(c)(1),

and required any "wavier motion to be 'accompanied by a written statement of reasons' from the prosecutor." State in Int. of Z.S., 464 N.J. Super. 507, 516 (App. Div. 2020) (quoting N.J.S.A. 2A:4A-26.1(a)).  This statement of reasons must "'clearly set[] forth the facts used in assessing all [of the enumerated waiver] factors . . . together with an explanation as to how evaluation of those facts supports waiver for each particular juvenile.'"  Ibid.  (quoting N.J.S.A. 2A:4A-26.1(a) (emphasis in original)).  Those eligibility factors include the nature and circumstances of the offense, the degree of the juvenile's culpability, the juvenile's age and maturity, the degree of criminal sophistication, prior history of delinquency, among others.  See N.J.S.A. 2A:4A-26.1(c)(3).

Recent developments in New Jersey sentencing law provide juveniles with further protections.  In Zuber, 227 N.J. at 451, our Supreme Court held that judges must "take into account how children are different," and consider the factors enumerated in Miller v. Alabama, 567 U.S. 460, 479 (2012), before sentencing juveniles to life imprisonment without the possibility of parole or its practical equivalent.  Zuber, 227 N.J. at 429.  These factors include "immaturity and 'failure to appreciate risks and consequences'; 'family and home environment'; family and peer pressures; 'an inability to deal with police officers or prosecutors' or the juvenile's own attorney; and 'the possibility of rehabilitation.'"  Ibid. (quoting Miller, 567 U.S. at 477-78).

Beyond the <u>Miller</u> factors, our Legislature also recently revised the sentencing criteria to require sentencing courts to consider a defendant's youthful status as an independent factor in the sentencing calculus. <u>See</u> N.J.S.A. 2C:44-1(b)(14). The court must consider defendant's age in mitigation of any aggravating factor if "defendant was under twenty-six years of age at the time of the commission of the offense." <u>L.</u> 2020, <u>c.</u> 110 (eff. Oct. 19, 2020).

In addition, in <u>P.M.P.</u>, 200 N.J. at 177, the Court held that the Code of Juvenile Justice requires a juvenile defendant "to have 'counsel at every critical stage of the proceeding which, in the opinion of the court may result in the institutional commitment of the juvenile.'" <u>Ibid.</u> (quoting N.J.S.A. 2A:4A–39(a)). Thus, because the filing of the juvenile complaint by a prosecutor's office, followed by the issuance of a judicially approved arrest warrant, constituted a "critical stage" of the proceedings, the Court concluded that the statutory right to counsel was implicated, and the defendant could not waive his <u>Miranda</u> rights in the absence of his attorney. <u>Id.</u> at 177-78.[4]

---

[4] Defendant also relies upon N.J.S.A. 2A:4A-38 and N.J.S.A. 2A:4A-39 to support his argument that juveniles, even those waived to adult court, should receive special protections under our evidence <u>Rules</u>. We acknowledge these protections provided by the Code of Juvenile Justice, but we are not persuaded that these statutory provisions apply here. Defendant was not denied representation at a detention hearing, N.J.S.A. 2A:4A-38, and his statements from a waiver proceeding were not introduced at trial, N.J.S.A. 2A:4A-39.

Defendant argues the <u>Presha</u> "voluntariness inquiry" has "no place" once a juvenile delinquency complaint has been filed, and urges us to draw a bright-line rule declaring all statements given by a juvenile in the absence of an attorney per se involuntary and inadmissible for any purpose. We decline to do so and note that here, defendant's counsel conceded his statement was not coerced and determined an N.J.R.E. 104 hearing on the issue was not required.

We are satisfied that any inherent impulsivity or vulnerability due to defendant's age has been remedied by the preclusion of his statement in the prosecution's case-in-chief. Further, we do not believe the aforementioned jurisprudence, including <u>Zuber</u> and <u>P.M.P.</u>, would be contravened by preventing the State from impeaching defendant with his inconsistent statements. In sum, we are not persuaded that New Jersey's juvenile protections should be expanded so far such that a juvenile waived to adult court is permitted to lie[5] under oath, without permitting the State the opportunity to confront defendant with his or her prior inconsistent statement.

> **[At the direction of the court, the published version of this opinion omits the discussion of additional issues in Parts III through VII. <u>See</u> <u>R.</u> 1:36–3.]**

---

[5] We do not presume that a defendant's uncounseled statement to the police was necessarily truthful and that his contrary testimony at trial is necessarily false. What we are saying is that the State is entitled to impeach the defendant at trial to highlight the disparity.

To the extent we have not specifically addressed any of defendant's arguments, it is because we have concluded they are of insufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2694-18

29